**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*)
Louis C. Ludwig (NJ 043582008)
10 South LaSalle St., Ste. 3505
Chicago, IL 60603
Telephone: (312) 377-1181
jpsilverman@pomlaw.com
lcludwig@pomlaw.com

**FREEDMAN NORMAND FRIEDLAND LLP**
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman (*pro hac vice*)
1 SE 3rd Ave., Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
ingo@fnf.law
vel@fnf.law

*Counsel for Lead Plaintiff and the Class*

- additional counsel on signature page –

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE CORMEDIX INC. SECURITIES LITIGATION | Case No. 2:21-cv-14020-JXN-CLW |
| | CLASS ACTION |
| | Hon. Julien Xavier Neals |
| This Document Relates To: | **Motion Day: February 21, 2023** |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ......................................................... ii

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF RELEVANT FACTS.................................................................4

    A. CorMedix's Core Focus on Neutrolin and Bid for FDA Approval..................................................................4

    B. Defendants Continue to Deceive Investors About the NDA ...........7

    C. Investors Slowly Learn the Truth.......................................9

ARGUMENT ..................................................................11

    I. Plaintiff Adequately Alleges Violations of § 10(b) of the Exchange Act..................................................................11

    A. Legal standards on Rule 12(b)(6) Motion to Dismiss...................11

    B. The Complaint Alleges §10(b) Violations Regarding DefenCath..................................................................13

        1. The Complaint sufficiently identifies material misrepresentations and omissions regarding DefenCath..................................................................13

            a. Misrepresentations and omissions about the status of facilities manufacturing DefenCath..........................13

            b. Misrepresentations and omissions about being "on track" .........................................................16

            c. Misrepresentations and omissions regarding likelihood of approval...............................................18

       d.  Misrepresentations regarding delays and risks..........19

       e.  Defendants' misrepresentations and omissions do not qualify as opinions or forward-looking statements ...............................................................22

    2.  The Complaint adequately alleges Defendants' scienter..24

       a.  That Defendants held themselves out to investors as having knowledge of the facts they misrepresented supports scienter ........................................................25

       b.  Defendants' access to facts contradicting their public statements supports scienter .....................................28

       c.  Core operations theory supports scienter ..................30

       d.  Defendants Armstrong and Todisco's experience bolsters scienter ........................................................31

       e.  Defendants' SOX certifications bolster scienter .......32

       f.  No plausible competing inference............................32

    3.  The Complaint adequately alleges loss causation.............34

II.   Plaintiff Adequately Alleges Violations of § 11 of the Securities Act..................................................................................36

   A. The Securities Act Places a Minimal Pleading Burden on Plaintiff..................................................................................36

   B. Plaintiff's Securities Act Claims Do Not Sound in Fraud............36

   C. Plaintiff Adequately Alleges Falsity in the Offering....................38

CONCLUSION.................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..................................................................................27

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)...................................................................27

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*,
503 F.3d 256 (3d Cir. 2007) ................................................................................27

*Bauer v. Eagle Pharm., Inc.*,
No. CV 16-3091(JLL), 2017 WL 2213147 (D.N.J. May 19, 2017)...................24

*Bauer v. Prudential Fin., Inc.*,
No. CIV.A. 09-1120 (JLL), 2010 WL 2710443 (D.N.J. June 29, 2010) .....37, 38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................12

*Carmack v. Amaya Inc.*,
258 F. Supp. 3d 454 (D.N.J. 2017).....................................................................13

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
No. CV 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ..........................30

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................34

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ...............................................................................34

*Fleisher v. Standard Ins. Co.*,
679 F.3d 116 (3d Cir. 2012) ...............................................................12, 15, 36

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014)..........................................................*passim*

*Gaer v. Educ. Mgmt. Corp.*,
No. CIV.A. 10-1061, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011)................38

*Gargiulo v. Isolagen, Inc.*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007)....................................................................15

*Hall v. Johnson & Johnson*,
  No. CV 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ...............26

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)............................................................................................36

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019)................................................................40

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  No. 2:20-cv-2155-SRC-CLW, 2021 WL 4191467
  (D.N.J. Sept. 15, 2021) ...............................................................................29, 30, 31

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ...............................................................................15

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 524 (3d Cir. 1999)................................................................................24

*In re Amarin Corp. PLC Sec. Litig.*,
  689 F. App'x 124 (3d Cir. 2017) .......................................................................23

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
  No. 05-232, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ......................................38

*In re Bristol-Myers Squibb Sec. Litig.*,
  No. Civ.A. 00-1990(SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005)............23

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) .............................................................................12

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001)................................................................24, 28

*In re Celgene Corp. Sec. Litig.*,
  No. CV 18-4772, 2019 WL 6909463 (D.N.J. Dec. 19, 2019)...........................18

*In re Cigna Corp. Sec. Litig.*,
  No. Civ.A. 02-8088, 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005)...................17

iv

*In re Digital Island Sec. Litig.*,
   357 F.3d 322 (3d Cir. 2004) ...............................................................................17

*In re: Enzymotec Sec. Litig.*,
   No. CV-14-5556 (JLL)(MAH), 2015 WL 8784065
   (D.N.J. Dec. 15, 2015) ...............................................................................22, 30

*In re ForceField Energy Inc. Sec. Litig.*,
   No. 15 CIV. 3020 (NRB), 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017).........29

*In re Galena Biopharma, Inc. Sec. Litig.*,
   No. 17-929, 2021 U.S. Dist. LEXIS 1851 (D.N.J. Jan. 5, 2021) ......................35

*In re Genta, Inc., Sec. Litig.*,
   No. CIV.A. 04-2123 (JAG), 2005 WL 2416970 (D.N.J. Sept. 30, 2005)..........29

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021) ...............................................................39

*In re Honeywell Int'l, Inc. Sec. Litig.*,
   182 F. Supp. 2d 414 (D.N.J. 2002)....................................................................29

*In re Proshares Trust II Sec. Litig.*,
   No. 19 Civ. 886, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ..............................39

*In re PTC Therapeutics, Inc., Sec. Litig.*,
   No. 16-1124 (KM) (MAH), 2017 WL 3705801 (D.N.J. Aug.
   28, 2017) ............................................................................................................13

*In re Rediff.com India Ltd. Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004) ................................................................39

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..................................................................24

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) ...........................................................13, 36, 37, 38

*In re Toronto-Dominion Bank Sec. Litig.*,
   No. 17-1665, 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ...................................32

*In re Urban Outfitters, Inc., Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015)..................................................................35

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
   No. CV157658MASLHG, 2017 WL 1658822 (D.N.J. Apr. 28, 2017) .......25, 38

*In re ViroPharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ............................................................16, 22

*In re Viropharma, Inc. Sec. Litig.*,
   No. CIV.A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).....................34

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) .............................................................................21

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014)...............................................................34, 35

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ......................................................................*passim*

*Martin v. GNC Holdings, Inc.*,
   757 F. App'x 151 (3d Cir. 2018) .......................................................................30

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)......................................................................................11, 13

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007) .............................................................................34

*McDermid v. Inovio Pharms., Inc.*,
   520 F. Supp. 3d 652 (E.D. Pa. 2021)................................................................31

*Medtronic Ave, Inc. v. Bos. Sci. Corp.*,
   No. CIV.A. 98-478-SLR, 2001 WL 652016 (D. Del. Mar. 30, 2001) ...............12

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ............................................................................39

*Roofer's Pension Fund v. Papa*,
   No. CV 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ...........................26

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018)............................................18, 19, 26, 28

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
   348 F. Supp. 3d 313 (S.D.N.Y. 2018) .................................................................22

*Skiadas v. Acer Therapeutics Inc.*,
   No. 1:19-CV-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) .........19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..............................................................................13, 25, 27

*Tomaszewski v. Trevena*, Inc.,
   482 F. Supp. 3d 317 (E.D. Pa. 2020)....................................................18, 33, 34

*T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*,
   No. CV 16-5034 (MAS) (LHG), 2018 WL 395730 (D.N.J. Jan. 12, 2018) ......28

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*,
   659 F.3d 295 (3d Cir. 2011) ...............................................................................12

*Utesch v. Lannett Co., Inc.*,
   385 F. Supp. 3d 408 (E.D. Pa. 2019)..................................................................26

**Rules**

Rule 9(b)....................................................................................................3, 12, 37

Rule 12(b)(6).....................................................................................................11, 12

SEC Rule 10b-5 ......................................................................................................13

17 C.F.R. § 229.105 ...............................................................................................39

17 C.F.R. § 229.303(a)...........................................................................................39

**Statutes**

15 U.S.C. §78j(b) ...................................................................................................13

15 U.S.C. §77k(a) ...................................................................................................36

15 U.S.C. § 77 k(b) .................................................................................................36

15 U.S.C. §78u-4(b)(2) .....................................................................................12, 24

Private Securities Litigation Reform Act of 1995 ...........................................*passim*

Securities Act of 1933..............................................................................3, 36, 37, 38

Securities Exchange Act of 1934..........................................................3, 11, 25, 37

Lead Plaintiff John V. Levon ("Plaintiff") hereby opposes the motion to dismiss filed by Defendants as follows:[1]

## **PRELIMINARY STATEMENT**

During the Class Period, Defendants inflated the price of CorMedix stock by touting the approval prospects of the Company's flagship product, an antibacterial and antifungal catheter lock solution called "Neutrolin" (called "DefenCath" in the U.S.). Defendants then capitalized on this stock price increase by conducting a public offering on July 29, 2020 and an "At the Market" offering on November 27, 2020 (the "Offerings"), collectively raising more than $60 million. These ill-gotten gains were made possible by Defendants' misleading statements to CorMedix investors, such as the false reassurance that "[o]ur press release of July 9 … *was intended to be a clear signal from CorMedix to the life science investors that we understand the importance of manufacturing data and that we are on top of it.*" ¶165. In reality, the New Drug Application ("NDA") that CorMedix submitted confidentially to the U.S. Food and Drug Administration ("FDA") for DefenCath was critically defective, exposed

---

[1] "Defendants" are CorMedix Inc. ("CorMedix" or the "Company"); the "Officer Defendants", comprised of Khoso Baluch, Robert Cook, Matthew David, Phoebe Mounts, John L. Armstrong, and Joseph Todisco; and the "Director Defendants", comprised of Janet Dillione, Myron Kaplan, M.D., Alan W. Dunton, M.D., Steven Lefkowitz, Paulo F. Costa, and Greg Duncan. Paragraph citations ("¶") refer to the numbered paragraphs of Plaintiff's Second Consolidated Amended Class Action Complaint ("Complaint") (ECF No. 79). "DM" refers to the pages of Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint (ECF No. 86-1). Unless otherwise noted, internal citations are omitted and emphasis is added.

CorMedix's lack of consideration for FDA's requirements, and laid bare CorMedix's failure to oversee and remedy multiple issues at its designated manufacturing facility. Due to CorMedix's failure in the Chemistry, Manufacturing, and Control (CMC) aspects of its NDA and inability to remedy its manufacturing issues, the FDA rejected DefenCath via a Complete Response Letter (or "First CRL"), disclosed in March 2021, which itemized multiple concerns and deficiencies. The First CRL and related revelations caused CorMedix's share price to drop sharply, damaging Plaintiff and other investors.

Nonetheless, Defendants continued to falsely reassure investors *for nearly 12 months* that all manufacturing deficiencies had been resolved, and resubmitted the DefenCath NDA in February 2022. Defendants, however, still did not address these manufacturing deficiencies and, in August 2022, CorMedix received *another CRL* (or "Second CRL") for similar and additional non-compliant manufacturing conditions that led to the First CRL. CorMedix's stock price fell even more sharply than it did after the First CRL as investors had consistently been told that the issues were minor and many would be fixed in weeks, thereby causing Plaintiff and the putative class to suffer further losses and damages.

Despite generating and submitting an initial DefenCath NDA, and then resubmitting a second DefenCath NDAs, and being required by FDA regulations to know the inner workings of the Company's designated manufacturer, Defendants misrepresented or omitted the existing, but undisclosed, manufacturing conditions and

2

risks plaguing the DefenCath NDA from their SEC filings, public statements, and Offering Documents. In their respective motions, Defendants rely on the same misleading language challenged in the Complaint to argue that their Class Period statements regarding the FDA status of CorMedix's flagship product were no more than opinions, aspirational conjecture, or mere bluster. Regardless, binding precedent rejects the notion that Defendants can insulate their statements from liability with nothing more than artful phrasing.

In making their public statements, Defendants possessed the requisite state of mind (or *scienter*) for recklessness under the Exchange Act because they knew, or had access to, information contradicting those statements. Lastly, Plaintiff's loss causation allegations easily satisfy the pleading standard, which requires only that Plaintiff allege a causal connection between Defendants' conduct and his (and the Class's) losses.

Plaintiff's claims under the Securities Exchange Act of 1934 ("Exchange Act"), which relate to the Class Period (October 16, 2019 and August 8, 2022, inclusive) are sufficiently pled. Complaint ¶¶382-93 address fraudulent misrepresentations made by the Defendants as set forth in ¶¶94-98; 104-30; 251-359. Complaint ¶¶394-98 show that the Officer Defendants are secondarily liable as control persons for the misrepresentations identified, and allege the factual basis for each control relationship.

Plaintiff's claims under the Securities Act of 1933 ("Securities Act") are sufficiently alleged to satisfy the requisite pleading standard, and are not subject to the enhanced pleading requirements of either Rule 9(b) or the Private Securities Litigation

3

Reform Act of 1995 ("PSLRA"). Complaint ¶¶145-57 explain that the Offering Documents for the Offering (Registration Statement, Prospectus Supplement, and the Company's other public filings incorporated by reference therein) were materially false and misleading, and why each named Defendant is strictly liable for misrepresentations and omissions therein. Complaint ¶¶158-64 allege that certain Defendants were also secondarily liable due to their control over the corporate entity or their own subordinates, and plausibly alleges the nature of such control.

Accordingly, Defendants' motion should be denied in its entirety.

## STATEMENT OF RELEVANT FACTS

### A.    CorMedix's Core Focus on Neutrolin and Bid for FDA Approval

At all relevant times, CorMedix has primarily focused on developing Neutrolin a/k/a DefenCath, an antibacterial and antifungal solution designed to prevent catheter-related bloodstream infections and thrombosis in patients in clinical settings—a catheter lock solution ("CLS"). ¶2. CorMedix has always manufactured Neutrolin through third-party commercial manufacturing organizations called "CMOs." ¶3. In late 2013, the Company first met with the FDA to discuss its plan to market Neutrolin in the U.S. ¶70. Since then, that plan has remained – albeit unsuccessfully – in place.

Drug sponsors like CorMedix must submit an NDA to the FDA to seek approval of a new drug for U.S. sale, marketing, and commercial distribution. ¶5. After successful clinical trials are completed, an NDA must successfully demonstrate Chemistry, Manufacturing and Controls ("CMC") to ensure that the drug is

4

consistently effective, safe, and high quality. ¶¶6, 72. CMC applies to the drug itself and the facility manufacturing the drug. ¶6. Pursuant to FDA-approved industry guidance, the drug sponsor "is ultimately responsible to ensure processes are in place to assure the control of outsourced activities and quality of purchased materials." ¶80. Among them, a drug sponsor is responsible for evaluating and monitoring its own CMO. ¶¶72-84.

To examine a manufacturer's compliance with cGMP (Good Manufacturing Practice) regulations and determine if it has the necessary facilities, equipment, and ability to manufacture the drug, the FDA may perform a pre-approval inspection ("PAI"), which includes the manufacturer obtaining approval for its written procedures related to production, quality control, and quality assurance, as well as verification of these procedures. ¶¶19, 85-86. While some modifications were made to these protocols at the height of the COVID-19 pandemic, the FDA affirmed "CGMP requirements remain[ed] in effect during the COVID-19 public health emergency." ¶92.

Under cGMP regulations and the Company's communications with the FDA, the Company and Officer Defendants were ultimately responsible for ensuring processes were in place to assure the control of outsourced activities (*e.g.*, manufacturing) and quality of purchased substances (*e.g.*, heparin). ¶19. Unbeknownst to investors, however, the CorMedix Defendants submitted the DefenCath NDA without verifying its completeness or maintaining sufficient processes and controls, or demonstrating that contracting facilities had met and would continue to meet FDA

5

standards. *Id.* To select a CMO for its planned entry into the U.S. market, CorMedix began the evaluation process in late 2016. ¶93. After contacting and having initial discussions with thirteen potential CMOs in the U.S. and internationally, and reviewing proposals from several of those thirteen, the Company ultimately selected – but did not publicly disclose – its CMO in 2017. *Id.*

On October 16, 2019, the Company announced a "[s]uccessful CMC Interaction with the FDA." ¶94. It stated that "[t]he FDA was supportive of Neutrolin's proposed manufacturing program, including … the container closure and testing, and indicated that it will conduct a thorough review of all the CMC information as well as assess the commercial readiness of the various manufacturing facilities at the time of NDA filing" and that "[n]o further CMC meetings with FDA [we]re planned prior to NDA submission." *Id.* That statement omitted known CMC deficiencies, as well as the likely consequences of those concealed deficiencies, such as non-approval of the DefenCath NDA. ¶34.

On November 14, 2019, during an investor call, Armstrong disclosed that, during the CMC interaction, the "FDA did request some additional data which [the Company was] working to complete" and that, in addition to conducting a thorough review of all CMC information, the FDA planned to "assess the commercial readiness of the various manufacturing facilities at the time of the NDA review." ¶95. But Armstrong also falsely assured investors that CMC was no roadblock, stating that: "[t]he FDA was supportive of Neutrolin's proposed manufacturing program." ¶184.

6

In May 2020, CorMedix formed a wholly-owned subsidiary in Madrid, Spain, but did not explain why to investors. The reason appears to be that the manufacturing facility of the Company's most likely CMO, ROVI Contract Manufacturing, S.L., which specializes in aseptic filling small volume parenterals in pre-filled syringes and vials, with an annual capacity of 180 million syringes and 50 million vials, is located in Madrid. ¶232.

By July 8, 2020, CorMedix had completed its rolling submission for the DefenCath NDA, assuring investors that it "has not been informed of any delays by the FDA in the review of the NDA" and simply noted that, to complete the NDA, the Company "had to work through the [CMC] information[.]" ¶97. Yet from the time they said this, Defendants knew the DefenCath NDA already had numerous review issues. Nor did this knowledge stop Defendants from capitalizing on the Company's positive public image to sell shares to investors. On July 27, 2020, CorMedix announced its plans for an underwritten public offering. ¶174. Ultimately, CorMedix offered and sold 5,111,110 shares of common stock. ¶176.

**B.    Defendants Continue to Deceive Investors About the NDA**

When touting their submission of the DefenCath NDA to the market, Defendants omitted to disclose that the NDA did not contain all the necessary information and/or data, based on well-established regulatory standards as well as the Company's ongoing dialogue with the FDA. ¶98. Instead, Defendants spoke of the NDA's success as a foregone conclusion. For example, as early as August 10, 2020, Baluch claimed that

7

CorMedix was already "***making necessary preparations for the launch of DefenCath in the U.S. hemodialysis market, following FDA approval.***" ¶119.

In November 2020, CorMedix filed with the SEC its Registration Statement for its $100 million "At the Market" (or ATM) Offering, which continued to exploit the false perception that FDA approval was a *fait accompli*. ¶99. The Prospectus Supplement for the Offering incorporated by reference numerous SEC filings containing material falsehood and omissions. ¶103. During the six months ended June 30, 2021, the Company realized net proceeds of approximately $41.5 million through stock sales. ¶101.

On August 12, 2021, CorMedix, still capitalizing on the inflated price of its securities, announced the completion of its ATM Sales Agreement with sales agents, thus allowing the Company to sell up to $50 million of common stock. ¶¶102, 207. The concurrently-issued Prospectus Supplement incorporated the same false SEC filings as the November 2020 Prospectus Supplement. ¶103. During the six months ended June 30, 2022, CorMedix realized net proceeds of approximately $11.42 million through stock sales in connection with the ATM Sales Agreement. ¶102.

In addition to the false and/or misleading documents incorporated in the Company's Prospectus Supplements, Defendants regaled investors with new distortions, such as positively touting "the level of engagement between FDA and the CorMedix team" and misrepresenting whether the DefenCath NDA was "on track" for approval, supposedly prospective "risks" that had, in truth, already come to pass, as

well as misrepresenting whether CorMedix's SEC filings fairly presented, "in all material respects, the financial condition and results of operations of the Company." *See e.g.*, ¶¶28, 35, 109, 172, 195-96, 206, 260-64, 270, 295.

As alleged in the Complaint, by this time, the Company's CMC program had been considered deficient by the FDA, the FDA had already notified CorMedix of these concerns, and CorMedix had already submitted additional (but insufficient) data to the FDA regarding these deficiencies. ¶98. These problems were known and should have been disclosed to investors. But, as a result of their nondisclosure, CorMedix was able to benefit from a highly inflated share price.

On August 31, 2020, CorMedix issued a press release, announcing the FDA's acceptance for filing and priority review of the DefenCath NDA and setting a PDUFA date (or review target date) of February 28, 2021. ¶123. The press release announcing the PDUFA date falsely disclaimed the existence of any known review issues. *Id.*

## C.   Investors Slowly Learn the Truth

On March 1, 2021, CorMedix shocked the market by announcing a CRL (or FDA rejection) instead of FDA approval, ¶¶20-21, after the "FDA noted concerns at the third-party manufacturing facility after a review of records requested by FDA and provided by the manufacturing facility." ¶181. CorMedix shares promptly fell $8.16 per share, or 54.4%, to close at $6.84 on March 3, 2021. *Id.* Because the Company had not been transparent about its CMC problems, analysts expressed "***surprise.***" ¶183.

While Defendants could not avoid disclosing an event as momentous as the First

CRL, they nevertheless continued to mislead investors by falsely suggesting that: (i) the issues underlying the First CRL were minor and could be fixed in weeks, so the Company would be able to resubmit the DefenCath NDA in the near future. ¶¶184-96; and (ii) Defendants were "on track" to secure FDA approval. *Id.*

But on April 14, 2021, CorMedix admitted that it would not be able to resubmit its NDA until the third quarter of 2021 because it had to take additional steps to bring DefenCath's manufacturing process up to FDA standards, including "[a]ddressing FDA's concerns regarding the qualification of the filling operation [that] may necessitate adjustments in the process and generation of additional data on operating parameters for manufacture of DefenCath." ¶315. CorMedix shares fell in response by 18%. ¶316. Then, after markets closed on May 13, 2021, CorMedix disclosed that it would not be able to resubmit the NDA until **the fourth quarter of 2021** because "additional process qualification would be needed with subsequent validation to address the deficiencies[.]" ¶321. At the same time, Defendants doubled down on their claimed ability to resolve the manufacturing deficiencies and resubmit the NDA by the end of the year. ¶322.

Investors learned more about the true state of the Company's manufacturing deficiencies pre-market on September 7, 2021, when CorMedix disclosed that it "has encountered delays at its third-party [CMO]" and that "the timeline for CorMedix and the CMO to address deficiencies at the facility that are required for resubmission of the DefenCath NDA is uncertain[.]" ¶340. In other words, "CMO delay br[ought]

10

uncertainty to Defencath NDA resubmission timelines[.]" *Id*. On this news, CorMedix's stock price fell over 27%. ¶341. Defendants did not resubmit the NDA until February 28, 2022 (¶217) and afterwards persisted in conveying to investors that the Company had closely worked with its third-party manufacturers and suppliers to ensure that it could finally demonstrate that it could manufacture DefenCath for commercial use according to cGMP standards. ¶228.

Ultimately, investors learned the full truth on August 8, 2022. Only then did CorMedix finally admit that in addition to identified deficiencies at its heparin supplier, manufacturing issues still existed at its CMO that were so severe that they required a Second CRL. As CorMedix conceded, the Second CRL "from the FDA stat[ed] that the DefenCath NDA cannot be approved until deficiencies recently conveyed to the [CMO] and the supplier of the [API] heparin during inspections are resolved to the satisfaction of FDA." ¶¶32, 229. Making things worse, it was also determined that the CMO needed "an independent CGMP consultant to expedite the implementation of corrective actions." ¶32. In direct response, CorMedix's stock price fell $4.32 per share, or a staggering ***57.45%***, to close at $3.20 per share on August 9, 2022. ¶361.

**ARGUMENT**

## I.    Plaintiff Adequately Alleges Violations of § 10(b) of the Exchange Act

### A.    Legal standards on Rule 12(b)(6) Motions to Dismiss

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx*

11

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The question is not whether the plaintiff "will ultimately prevail" but whether it is "entitled to offer evidence to support the claims." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). On a Rule 12(b)(6) motion to dismiss, courts will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

For §10(b) claims, the PSLRA and Federal Rule of Civil Procedure ("Rule") 9(b) impose two additional pleading standards. First, misrepresentations must be alleged with particularity. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009). This does not call for an "exhaustive cataloging of facts," but only allegations sufficient to "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Bos. Sci. Corp.*, No. CIV.A. 98-478-SLR, 2001 WL 652016, at *2 (D. Del. Mar. 30, 2001). Particularity rules are relaxed in situations where, as here, the factual information is peculiarly within defendants' knowledge or control. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Second, the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter. *See* 15 U.S.C. §78u-4(b)(2). The inference need not be "irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing

12

inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. Scienter may be established by showing that defendants acted either consciously or recklessly. *In re PTC Therapeutics, Inc., Sec. Litig.*, 2017 WL 3705801, at *16 (D.N.J. Aug. 28, 2017). Scienter of executives acting within the scope of employment is imputed to the corporation. *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 468 (D.N.J. 2017).

### B.    The Complaint Alleges §10(b) Violations Regarding DefenCath

To plead a claim under §10(b), 15 U.S.C. §78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37-38; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The Complaint easily satisfies these elements.

### 1. The Complaint sufficiently identifies material misrepresentations and omissions regarding DefenCath

### a. <u>Misrepresentations and omissions about the status of facilities manufacturing DefenCath</u>

Plaintiff has properly pled that Defendants made direct misrepresentations about the adequacy of the Company's manufacturer. Just before the Class Period began,

13

Armstrong claimed to "*understand Neutrolin's manufacturing, technical, analytical processes as well as the quality controls and the systems that go with it*…. *And importantly, the key members of my staff, including me, have in our past experience, successfully submitted multiple NDAs that were ultimately approved*." ¶165. At the time, he further claimed, on behalf of the entire Company, to "*understand the importance of manufacturing data and that we are on top of it*." *Id.*

That claimed understanding and experience led investors to believe Defendants' distortions throughout the Class Period, including, *inter alia*, that:

- "CorMedix has been manufacturing and selling Neutrolin outside the US for the last five years. *We've successfully carried out … validation of the manufacturing process* which is enable the successful production of product at three different manufacturing sites." ¶165.

- "the drug product manufacturer ... is in place and *processes have been established and appropriate validation testing completed to enable manufacture of launch quantities.*" ¶256.

- "*[c]ompleting this filing was a major undertaking as the team had to work through the Chemistry Manufacturing and Control information, CMC,* and a large volume of data generated due to the size of LOCK-IT-100 trial and the underlying health issues of the hemodialysis patient group." ¶279.

- the First CRL disclosed on March 1, 2021 posed minimal hurdles that could be

quickly and easily resolved. ¶¶187-91.

- CorMedix had, ***in April 2021***, following receipt of the First CRL "[s]uccessfully concluded … validation of the drug product manufacturing process, which has enabled production at 2 different manufacturing locations[,]" and that "[l]aunch quantities are already in production[.]" ¶319.

- ***"we and the manufacturer have adequately addressed the concerns the [FDA] identified in the CRL and PAAL."*** ¶345

- "***CorMedix and the [CMO] have adequately addressed the concerns identified by FDA***...." ¶¶346-47

- if any risks did exist, that they would be outside the manufacturing operations related to DefenCath. ¶358.

These statements are actionable because Plaintiff "ha[s] alleged sufficient facts that if accepted as true, establish knowledge on the part of the Defendants that [the] statements ... were false or misleading or omitted a material fact." *Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007). When Defendants chose to speak about the present state of the Company's manufacturing capabilities in relation to the DefenCath NDA, they were obligated to disclose material facts related to that issue. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010).[2]

---

[2] Defendants improperly seek factual determinations at odds with the Complaint's well-pled allegations, which must be accepted as true at this stage. *See Fleisher*, 679 F.3d at 120. Specifically, Defendants seek merits determinations as to: i) whether

### b. **Misrepresentations and omissions about being "on track"**

The Complaint cogently pleads that Defendants repeatedly assured investors that DefenCath was on track to be approved, while at the same time withholding serious known risks about the sufficiency of the NDA and manufacturing capabilities of the Company's CMO. ¶¶108-48, 182-226. During the Class Period, Defendants told the market, *inter alia*, that:

- CorMedix "has not been informed of any delays by the FDA in the review of the NDA, but ... *pre-approval inspections are required for manufacturing sites*." ¶¶97, 120, 173, 177.

- "CorMedix remains on schedule for a potential NDA approval during the second half of 2020." ¶104.

- the FDA "noted that … *it had not identified any potential review issues* at this time." ¶¶128, 289, 291.

- "we look forward to *continuing to work together [with the FDA] expeditiously to complete the review of the Defencath NDA* to address an

---

certain FDA forms and correspondence are "final" and therefore require disclosure; and (ii) whether, despite Plaintiff's detailed allegations demonstrating Defendants' knowledge and obligation to assess CMO deficiencies, they might have remained ignorant of blatant problems occurring at the CMO. *See* DM at 18-19 & n.13. Such fact-intensive disputes are inappropriate for a motion to dismiss. *See In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 470 n.20 (E.D. Pa. 2014) (denying motion to dismiss and rejecting defendants' alternative version of the facts, noting plaintiff is entitled "to discovery to flesh out the truth of the narrative").

16

unmet medical need." ¶¶124, 285.

- "[w]e have remained on schedule towards an anticipated approval in the second half of 2020, subject of course to possible delays at FDA due to the coronavirus pandemic." ¶172.

- "we are maintaining our guidance for an anticipated decision on approval of the NDA in the second half of 2020." *Id*.

- "in terms of activities that we are currently undertaking, we are doing right now all the typical prelaunch planning." ¶¶226, 356.

- "*[s]o from everything that we can see*, I'm optimistic that everything is moving in the right direction." ¶358.

Defendants' decision to speak extensively and continually about the purported timeline for FDA approval created a corresponding duty to reveal the manufacturing issues that impeded that timeline. *See, e.g.*, *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3d Cir. 2004) (A duty to affirmatively disclose "'may arise when there is ... an inaccurate, incomplete or misleading prior disclosure'"). More directly, Defendants' "on track" statements are actionable because they falsified the then-current status of the DefenCath NDA. *In re Cigna Corp. Sec. Litig.*, No. Civ.A. 02-8088, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (finding statement that "we are on track with our own schedule" actionable where company was not "on track").

Third Circuit courts have repeatedly affirmed that the selective disclosure of data

17

is actionable under the federal securities laws. *See Tomaszewski v. Trevena*, Inc., 482 F. Supp. 3d 317, 331 (E.D. Pa. 2020) (omissions actionable where defendant knew that NDA would be deficient because he knew that Trevena's studies did not conform the primary or secondary endpoints to the FDA's requirements); *see also In re Celgene Corp. Sec. Litig.*, No. CV 18-4772, 2019 WL 6909463, at *18 (D.N.J. Dec. 19, 2019) ("that Defendants told investors about the positive clinical study results but failed to disclose the Metabolite discovery was misleading"); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 898 (E.D. Pa. 2018) (falsity alleged where defendants failed to disclose unfavorable data that would inform the FDA's decision); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 348-49 (E.D. Pa. 2014) (defendants "systemically misled investors about the key components of the … NDA and the nature of FDA feedback while presenting predictions about FDA approval … that [they] should have known were unreasonable under the circumstances").

### c. **Misrepresentations and omissions regarding likelihood of approval**

Defendants repeatedly and falsely informed investors that the FDA was inclined to approve DefenCath, despite deficiencies existing at the manufacturing facility that made FDA approval a longshot at best. Nevertheless, Defendants pretended to investors that these issues simply did not exist, and stated, *inter alia*, that:

- "As our press release of 16 October indicated the outcome of our interaction with the FDA was very positive. ***FDA was supportive of the core***

- ***manufacturing processes for the drug product*** and the active pharmaceutical ingredients for the inclusion as part of the NDA submission." ¶96.

- "our contract manufacturer is a reputable – highly reputable European manufacturer. ***I think they're going to take all care to work diligently through any observation and work with the FDA on, if necessary, improving any compliance concerns FDA could raise***." ¶227

- "***The FDA was supportive of Neutrolin's proposed manufacturing program....***" ¶¶249, 252, 255.

The law is clear: Defendants' blatant misrepresentations, which directly contradicted what they then knew, are actionable. *See SEB*, 351 F. Supp. 3d at 898 (Claims sustained where defendants, while "instilling hope in their investors …. failed to disclose the unfavorable data that would inform the FDA's decision"); *see also Frater*, 996 F. Supp. 2d at 348-49 (E.D. Pa. 2014) (plaintiffs adequately pled that "Hemispherx systemically misled investors about the key components of the [ ] NDA and the nature of FDA feedback while presenting predictions about FDA approval … that it should have known were unreasonable under the circumstances."); *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 4208442, at *8 (S.D.N.Y. July 21, 2020) (Claim stated where "Defendants knew that the FDA had not *agreed* to approve EDSIVO but that they chose to say the opposite.").

### d.  <u>Misrepresentations regarding delays and risks</u>

The Complaint adequately alleges that the deficiencies Defendants hid from the

market were far more likely to delay approval of the DefenCath NDA than the risks they "cautioned" investors about, *i.e.*, the delays at the FDA due to the coronavirus pandemic or other disruptions and the hypothetical possibility of regulatory violations that Defendants were actually and presently engaged in. Specifically, Defendants failed to disclose that the DefenCath NDA did not provide sufficient CMC data necessary to achieve regulatory approval as the Company had represented, and that it was currently at risk of receiving a CRL from the FDA, delaying the approval process. In place of honestly disclosing the actual, known problems that jeopardized the DefenCath NDA, Defendants further misled investors by characterizing the issues as hypothetical possibilities:

- "[d]ata provided by collaborators and others upon which we rely that has not been independently verified ***could*** turn out to be false, misleading, or ***incomplete***." Specifically, the 2019 10-K stated that "[w]e rely on third-party vendors, scientists, and collaborators to provide us with significant data and other information related to our projects, clinical trials, and business. ***If such third parties provide*** inaccurate, misleading, or ***incomplete data***, our business, prospects, and results of operations could be materially adversely affected." ¶¶107, 261.

- "[o]ur contract manufacturers ***may not*** be able to comply with the applicable FDA regulatory requirements, which could result in delays to our product development programs, could result in adverse regulatory actions against

them or us, and ***could prevent us*** from ultimately receiving product marketing approval."

- [a]pproval was "subject … to ***possible delays*** at FDA due to the coronavirus pandemic." ¶¶172, 266.

- CorMedix had minimized risk through "continuing initiatives to dual source key components and active ingredients in order to de-risk … ***potential governmental regulatory actions*** at any key supplier" (¶¶226, 355).

- "this is an inspection of facility that is larger than just the manufacturing operations related to DefenCath." ¶358.

Defendants' "risk disclosures" were not only ineffective, but themselves false and misleading because they affirmatively mischaracterized any "risks" to the DefenCath NDA as potential when real risks had already come to pass. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit").

Defendants further blurred the truth by prospectively warning of potential risks which had already come to pass. For example, Defendants claimed that "our contract manufacturers ***may not be able to comply with the applicable FDA regulatory requirements***, which could result in delays to our product development programs, could result in adverse regulatory actions against them or us, and could prevent us from ultimately receiving product marketing approval." ¶¶108, 262. Defendants also spoke

21

of adverse outcomes "***[i]f we and our contract manufacturers fail to achieve and maintain high manufacturing standards in compliance with cGMP[.]*" *Id.*

Deceitful "warnings" such as these have been held to create a duty to disclose and are not insulated, forward-looking statements. *See In re: Enzymotec Sec. Litig.*, No. CV-14-5556 (JLL)(MAH), 2015 WL 8784065, at *15 (D.N.J. Dec. 15, 2015) ("Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect."); *In re Viropharma*, 21 F. Supp. 3d at 471 (citing cases).

e. **Defendants' misrepresentations and omissions do not qualify as opinions or forward-looking statements**

Defendants' argument that their false and misleading statements should be excused as expectational or "forward-looking" should be rejected. *See* DM at 23-26. The Complaint does not allege that Defendants failed to correctly predict that the FDA would not approve DefenCath, but rather that Defendants concealed adverse events and risks that *had already occurred or were then in the process of occurring*.[3] It is well-

---

[3] *See*, *e.g.*, DM at 29 (wrongly claiming that "Plaintiff challenges CorMedix's optimism concerning FDA approval process and manufacturing"). Courts have rejected identical attempts to mischaracterize complaint allegations. *Frater*, 996 F. Supp. 2d at 348-49 (Defendants' claim that plaintiff's claim turned on likelihood of approval was "irrelevant to whether Hemispherx systemically misled investors about the key components of [ ] NDA and the nature of FDA feedback …."); *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324-25 (S.D.N.Y. 2018) ("At issue here are not Defendants' opinions about the NDA's prospects before the FDA, but

established that the "safe harbor or bespeaks caution [doctrine] provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon is one foot away." *In re Bristol-Myers Squibb Sec. Litig.*, No. Civ.A. 00-1990(SRC), 2005 WL 2007004, at *52 (D.N.J. Aug. 17, 2005).

Defendants' vague "cautionary language" did not describe then-identified manufacturing issues, and provides no cover for their misrepresentations. For example, in *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 131-32 (3d Cir. 2017), relied on by Defendants (DM at 29) despite it being not precedential, cautionary language applied only where the statements themselves were alleged to be false based on subsequent developments, rather than currently-existing facts, as here.[4]

Nor does including the word "expects" transform statements made about information known to Defendants no later than the start of the Class Period into "forward-looking." Where an alleged misrepresentations addressed already-known issues, "it cannot be that the mere inclusion of 'words of futurity or belief' brings otherwise non-forward-looking statements within the PSLRA safe harbor." *Frater*, 996 F. Supp. 2d at 348; *see also Bristol-Myers*, 2005 WL 2007004, at *24 (holding that

---

[their] allegedly false descriptions of the contents of the NDA itself.").

[4] Defendants' bid to contest materiality based on the supposed forward-looking nature of their statements (*see* DM at 28-29) is misplaced because, as discussed above, their statements were rooted in present fact.

23

statements, *inter alia*, that trial results "are very impressive results" are not puffery because they "refer[] specifically to the results from the [drug] trials—a matter of historical fact").[5]

## 2. The Complaint adequately alleges Defendants' scienter

To plead scienter, the PSLRA requires a plaintiff to allege facts which give rise to a strong inference that the defendant acted with the required state of mind in making misleading statements and/or omissions. 15 U.S.C. §78u-4(b)(2). In the Third Circuit, scienter is sufficiently alleged when a complaint's allegations give rise to a strong inference of "either reckless or conscious behavior." *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 524, 534-35 (3d Cir. 1999). Recklessness encompasses "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 280 (quoting *Advanta*, 180 F.3d at 535). Conscious behavior, meanwhile, exists where a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

---

[5] In *Bauer v. Eagle Pharm., Inc.*, No. CV 16-3091(JLL), 2017 WL 2213147 (D.N.J. May 19, 2017), cited by Defendants (DM at 26, 28, 30, 31), the statements held to be puffery were found not to "relat[e] to FDA approval" and thus do not articulate a rule relevant to the statements here. The alleged false statements in *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) were held to be future-oriented in nature, unlike those cited in the Complaint, which are based in matters of present fact.

In analyzing scienter, a court must determine "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. The inference of scienter, however, "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre." *Id.* at 324. The analysis must be "case specific" and should "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter."[6] *Avaya*, 564 F.3d at 269. The Complaint is clear that Defendants either knew of or recklessly disregarded the truth when making their false and misleading statements to investors during the Class Period.

### a. That Defendants held themselves out to investors as having knowledge of the facts they misrepresented supports scienter

Scienter is supported by Defendants' claims to have knowledge of, and the ability to discuss, DefenCath's potential NDA and whether the FDA was supportive of their application in private regulatory communications. ¶¶96, 169, 255. That Defendants' "statements to investors … implied that they had first-hand knowledge …. bolster[s] the inference that [defendants] 'knew at the time that [their] statements were

---

[6] For example, Plaintiff is not obliged to plead stock sales as a basis for scienter, as Defendants incorrectly suggest (DM at 14). *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. CV157658MASLHG, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017) ("Because it is plausible that the Exchange Act Defendants were caught before they had a chance to sell their shares, the mere fact that the Exchange Act Defendants did not sell their shares is insufficient to render Plaintiffs' allegations deficient.").

25

false or was reckless in disregarding the obvious risk of misleading the public.'" *PTC*, 2017 WL 3705801, at \*17 (quoting *Avaya*). Thus, courts consistently find scienter where defendants hold themselves out as knowledgeable about the misrepresented topics. *See, e.g.*, *SEB*, 351 F. Supp. 3d at 906 (scienter existed where "officers were speaking as authoritative sources who possessed the information to support their statements"); *Hall v. Johnson & Johnson*, No. CV 18-1833 (FLW), 2019 WL 7207491, at \*22 (D.N.J. Dec. 27, 2019) (CEO who "repeatedly professed to have knowledge regarding" issues at the heart of the misstatements acted with scienter).

Here, Defendants not only spoke with authority about the DefenCath NDA, but provided responses to pointed questions and topics about DefenCath and the NDA process that gave investors the impression of knowledge. *E.g.*, ¶¶11-12, 23, 95-96, 168-69, 172, 187-89, 191, 203; *see Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229, at \*22 (D.N.J. July 27, 2018) (finding a strong inference of scienter in part due to defendants' "statements implying firsthand knowledge" and "their responses to specific questioning").[7] This is especially true with respect to Defendants' characterizations of FDA feedback, which implied that Defendants were authoritative speakers on DefenCath's FDA approval process. *See, e.g.*, ¶¶255, 291, 292, 304-06,

---

[7] Moreover, Defendants' certainty when being directly questioned by analysts about potential FDA approval bolsters the already strong inference of scienter. *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (finding scienter where "a high-ranking officer evinces certitude as to a matter, particularly where the underlying substance is being publicly questioned").

322; *Frater*, 996 F. Supp. 2d at 349-50 (finding scienter where defendants conveyed FDA feedback to investors, thereby implying that they were knowledgeable sources who knew the entirety of FDA feedback).

Defendants' failure to meaningfully address this glaring indicator of scienter concedes it. *See Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 258 n.1 (3d Cir. 2007) ("Absent compelling circumstances not present here, failure to raise an argument in one's opening brief waives it."). Defendants' profession of knowledge, taken together with the fact that the misstatements and omissions directly concerned the Company's core operations, demonstrates a strong inference of scienter. *See, e.g., Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 232-33 (E.D. Pa. 2021) (holding that the "core business doctrine has relevance as an additional source of support for the inference of scienter" where "some of the individual Defendants possesses personal knowledge giving rise to a strong inference of scienter").[8]

---

[8] That Defendants' misrepresentations were directly related to the Company's core operations undermines their claim that Plaintiff has failed to allege motive, which can be relevant to the holistic review of scienter, but is not necessary. *Avaya*, 564 F.3d at 276-277; *Tellabs*, 551 U.S. at 325 (holding that "the absence of a motive allegation is not fatal"). Nonetheless, here, Plaintiff alleges that Defendants had significant financial motives to hide material risks regarding the DefenCath NDA because the Company's survival virtually depended on it. ¶69. The Complaint further alleges that Defendants' false and misleading statements allowed the Company to raise tens of millions of dollars through the Offerings than it otherwise would have. ¶¶99, 101, 102, 103, 207.

**b. <u>Defendants' access to facts contradicting their public statements supports scienter</u>**

Scienter is adequately pled on conscious misbehavior grounds where a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Campbell Soup*, 145 F. Supp. 2d at 599 (internal citation omitted); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (access to facts contradicting statements to investors is "classic evidence of scienter."). While Defendants contend that scienter cannot be established by the high-level nature of the Officer and Director Defendants' positions within CorMedix, *see* DM at 16, courts in this district have rejected such arguments, holding that allegations that a defendant's executive position provided "access to information contradicting [that defendant's] public statements," taken together with other allegations of scienter, suffice to create a strong inference of scienter. *See T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*, No. CV 16-5034 (MAS) (LHG), 2018 WL 395730, at *6-*7 (D.N.J. Jan. 12, 2018).

Here, the Defendants' positions provided them with access to knowledge that contradicted their public statements about DefenCath's FDA approval and manufacturing. *E.g.*, ¶¶54-57, 65. This, viewed in concert with the other allegations of scienter, including the fact that the misrepresentations and omissions concerned CorMedix's core operations, gives rise to a strong inference of scienter. *See SEB*, 351 F. Supp. 3d at 905-06 (holding that "an inference of scienter may arise" by virtue of a

defendant's position when the misrepresentations and omissions involved core matters of central importance to the company and its executives); *see also PTC*, 2017 WL 3705801, at *17 (same); *In re Genta, Inc., Sec. Litig.*, No. CIV.A. 04-2123 (JAG), 2005 WL 2416970, at *6-*7 (D.N.J. Sept. 30, 2005) (same) (collecting cases).[9]

Moreover, a defendant's executive position can create a strong inference of scienter when the core operations theory applies, which, as discussed below, it does in this instance. *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, No. 2:20-cv-2155-SRC-CLW, 2021 WL 4191467, at *19 (D.N.J. Sept. 15, 2021) ("'[A] person's status as a corporate officer, when considered alongside other allegations, can help support an inference that this person is familiar with the company's most important operations.'"). Likewise, in *In re Honeywell Int'l, Inc. Sec. Litig.*, the court found that a defendant who was both the Chief Executive Officer and Chairman should have full knowledge of his company's operations and "[b]y virtue of his position he had to have known of the falsity of the representations he and his fellow officers made," establishing scienter. 182 F. Supp. 2d 414, 428 (D.N.J. 2002). Similarly here, the

---

[9] Defendants' throwaway bid to contest scheme liability, DM at 37-38, also fails. Plaintiff alleges that Defendants concealed known deficiencies that had the effect of artificially inflating the price of CorMedix stock during the Class Period and, in so doing, perpetrated a fraud upon the public. ¶¶165-248. Such allegations adequately state a claim for "scheme liability." *See In re ForceField Energy Inc. Sec. Litig.*, No. 15 CIV. 3020 (NRB), 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) (allegations of stock price inflation via undisclosed purchases held sufficient to plead scheme liability).

Officer and Director Defendants had full knowledge of CorMedix's operations and thereby knew the falsity of the representations they made to investors.

### c. Core operations theory supports scienter

"Under the core operations doctrine, material misrepresentations concerning core matters of central importance to a company may support an inference of scienter when accompanied by some additional allegation of specific information conveyed to management and related to the fraud." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, No. CV 17-10467, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019) (citing *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018)). "Allegations that fraud related to a high-earning segment of a company have been found sufficient to support a core operations inference." *Id*.

As the Complaint notes, the adverse developments at issue here impacted the most central aspect, or the core, of CorMedix's business, operations and revenue. ¶¶50, 69. This more than suffices to establish scienter under the core operations doctrine. *See, e.g.*, *Hall*, 2019 WL 7207491, at *21 (collecting cases and finding scienter where defendant considered the product at the heart of the misstatements a "flagship product"); *Carmignac*, 2019 WL 3451523 at *16 (finding scienter where the relevant section comprised 22% of defendant's business); *Enzymotec*, 2015 WL 8784065, at *17-*18 (finding scienter where the misstatements concerned defendants' core business "about which Defendants regularly spoke").

By contrast, *Industriens*, cited by Defendants, involved a product that was only

30

a fraction of a division that drove 50% of defendants' business and there were no "other, individualized allegations that further suggest that the officer had knowledge of the fact in question." 2021 WL 4191467, at *19. Plaintiff's Complaint involves CorMedix's flagship product and contains such allegations. ¶¶69, 96, 169, 225, 227, 255, 356. Finally, *Industriens* identifies a host of cases where the core operations theory did apply when, as here, the misstatements at issue "concern[ed] matters exceptionally impactful on the businesses at issue" and the company's stock price declined significantly upon disclosure of the truth. 2021 WL 4191467 at *19 n.33. On that basis, the doctrine should apply here even under *Industriens*.

## d. **Defendants Armstrong and Todisco's experience bolsters scienter**

A defendant's experience can be used to demonstrate that they knowingly misused terms or concepts to mislead the market. For example, a defendant's "background and experience in the pharmaceutical industry" strongly suggest that he understands how statements regarding pharmaceuticals could be misconstrued and/or misleading, bolstering scienter. *See McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 654 (E.D. Pa. 2021). Here, the Company itself touted Armstrong's more than 45 years of experience in the pharmaceutical industry. ¶46. Todisco also arrived at CorMedix with extensive experience in the pharmaceutical industry, ¶48. Analysts described Todisco's "onboarding as a positive sign for CRMD and DefenCath" because they "expect[e]d Mr. Todisco to have done a fair amount of due diligence before deciding to join CRMD at such a critical juncture." ¶224.

31

Moreover, Defendants Armstrong and Todisco consistently discussed the FDA approval process with great specificity, holding themselves out as having deep experiential knowledge of that process. ¶¶9, 11-12, 165, 169, 225, 255, 303, 353, 358.[10]

### e. **Defendants' SOX certifications bolster scienter**

The already strong inference of scienter is further supported by Baluch's and David's SOX certifications, which claim that each assessed Cormedix's disclosures and disclosure controls. ¶¶109, 121, 129, 263, 278, 290, 310, 333. Courts in the Third Circuit have held that this type of allegation can *contribute* to a court's finding of scienter, and it does so here. *See In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at *19 (D.N.J. Dec. 6, 2018).

### f. **No plausible competing inference**

Defendants do not attempt to raise a competing inference that would explain why they hid adverse data and regulatory communications from investors. Instead, they limit their purported "competing inference" to the strawman assertion that Defendants

---

[10] Conversely, the sudden October 4, 2021 departures of Armstrong and Baluch shortly after CorMedix's manufacturing woes began to become public (¶30), also support their scienter. "A resignation may support a finding of scienter because it may be implied that the individual knew of the fraud being perpetrated. Once those outside the fraud find out, supposedly, they terminate (or force to resign) all those who may have been responsible." *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665, 2018 WL 6381882, at *18 (D.N.J. Dec. 6, 2018). In particular, the Company's statement made contemporaneously with the departures that it did not have the "right team" to resolve the deficiencies, ¶30, strongly suggests both Defendants' involvement with the manufacturing issues plaguing CorMedix.

were not certain about the FDA's rejection. That, however, is not what the Complaint alleges, and it offers no competing inference applicable to well-pled Complaint allegations showing that Defendants knew of serious risks to FDA approval but hid those risks from investors.

When the Complaint is considered as written, *Tomaszewski*, cited *supra*, is remarkably on point. There, as here, the defendant company: (1) "was struggling to survive," (2) had "only one viable drug candidate," (3) fast-tracked its drug's FDA approval, meaning that "changing course in reaction to FDA's feedback would have cost time and money," and (4) had executives who knew of potential issues, but nevertheless made statements expressing confidence of FDA approval. *Tomaszewski*, 482 F. Supp. 3d at 330. As here, such facts support "a cogent and compelling inference that, in response to a time and money crunch, [defendants] took—and lost—a calculated gamble to initiate the preparatory work for the Phase 3 studies without FDA approval, and that when the FDA expressed disagreement, [defendant] deceived investors in the hope that the FDA would end up agreeing with the data from the Phase 3 studies and approve [the subject drug]." *Id*. at 333. While such a regulatory "Hail Mary" may make sense, if "Defendants misled [investors] about such risks by making assurances regarding the completeness of the data and likelihood of FDA approval, Defendants may be held liable." *Id*. at 335 n.100.

Similarly, the court in *Frater*, 996 F. Supp. 2d at 349, found a strong inference of scienter where "statements characterizing the feedback Hemispherx received from

the FDA at the June 8 meeting imply that speakers knew the entirety of the FDA's feedback, including its concurrent warning that it would be unusual for a resubmitted NDA to succeed based on reanalysis of previously submitted data." And, *In re Viropharma, Inc. Sec. Litig.*, No. CIV.A. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) found scienter adequately pled where defendants were aware of issues with Phase II trials but misrepresented them to investors. Here, as in *Tomaszewski*, *Frater* and *Viropharma*, Defendants gambled that the FDA would look past the internally-known, but not publicly disclosed, risks posed by their CMO – only coming clean when no other option remained. ¶¶298, 360.

### 3. The Complaint adequately alleges loss causation

The Supreme Court has made clear that alleging loss causation "should not prove burdensome" as a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Third Circuit has further held that loss causation inquiries are generally inappropriate on a motion to dismiss. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000).

A "[p]laintiff may adequately plead loss causation by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007) (holding loss causation

can be proven where "defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss," and that materialization of the risk "is consistent with our loss causation jurisprudence.").[11]

Here, the Complaint alleges that each corrective disclosure and risk materialization provided the market information that had previously been concealed about the DefenCath NDA and were promptly followed by declines in the price of CorMedix stock. For each disclosure, the Complaint reveals what new information was disclosed to the market and how it related to Defendants' prior concealment. Thus, the Complaint not only satisfies, but exceeds, the "some indication" standard prescribed by *Dura*. *See* ¶¶298-368.

Defendants erroneously point to a price increase on March 9, 2021, DM at 38. This ignores Plaintiff's express allegations that even after the First CRL was disclosed, Defendants continued to mislead investors and downplay the gravity of the First CRL, ¶¶182-211, which explains the non-linear nature of the market's reaction. Finally, Defendants' reinterpretation of the September 7, 2021 disclosure merely raises a factual dispute to be resolved by the jury. DM at 39. For pleading purposes, the Court

---

[11] District courts within this Circuit have also accepted the materialization of the risk theory. *See*, *e.g.*, *Wilmington Trust*, 29 F. Supp. 3d at 450; *In re Urban Outfitters, Inc., Sec. Litig.*, 103 F. Supp. 3d 635, 657 (E.D. Pa. 2015) ("Plaintiff has adequately alleged a materialization of the concealed risk as well as a corrective disclosure...."); *In re Galena Biopharma, Inc. Sec. Litig.*, No. 17-929, 2021 U.S. Dist. LEXIS 1851, at *27 (D.N.J. Jan. 5, 2021) ("Plaintiffs have adequately pled loss causation through a materialization of the risk approach ….").

must accept Plaintiff's well-pleaded allegations as true and draw inferences in his favor. *See Fleisher*, 679 F.3d at 120. That the delays emanated from the same defective facility at the heart of the FDA's rejection of DefenCath is enough; if Defendants claim to have any admissible evidence refuting this fact, they may present that evidence at trial.

## II.      Plaintiff Adequately Alleges Violations of § 11 of the Securities Act

### A.      The Securities Act Places a Minimal Pleading Burden on Plaintiff

Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading ...." 15 U.S.C. §77k(a). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *Suprema*, 438 F.3d at 269. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman*, 459 U.S. at 382; 15 U.S.C. § 77 k(b).

### B.      Plaintiff's Securities Act Claims Do Not Sound in Fraud

Without analysis, Defendants assert, in conclusory fashion, that Plaintiff's §11 claim "sounds in fraud" and is therefore subject to heightened pleading requirements

36

under Rule 9(b) and the PSLRA. DM at 39, n.30. Not so.

The Third Circuit has explained that fraud "is not a necessary element to establish a prima facie claim under Section 11 or Section 12(a)(2)." *Suprema*, 438 F.3d at 270. "Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." *Id.* "Whether a Securities Act claim is subject to Rule 9(b) requires an assessment of the particular claim to determine whether acts of fraud on the part of the defendants form the basis for the claim against them." *Id.*

*First*, the Securities Act claim does not sound in fraud because it is brought on behalf of an entirely distinct class and expressly sounds in negligence, unlike the Exchange Act clams. ¶1. Moreover, Plaintiff alleges the Securities Act claim in the first part of the Complaint and the Exchange Act claims in the latter part, and did not incorporate the fraud allegations for the Exchange Act claims into the §11 claim. Such a clear delineation between claims supports a determination that the §11 claim does not sound in fraud. *Suprema*, 438 F.3d at 273; *see also Bauer v. Prudential Fin., Inc.*, No. CIV.A. 09-1120 (JLL), 2010 WL 2710443, at *4 (D.N.J. June 29, 2010) ("The allegations in Plaintiff's Amended Complaint are more akin to the expressly negligence-based allegations made in [*Suprema*].").

*Second*, the allegations in the §11 claim are couched in the language of negligence, not fraud. ¶¶66-67. By contrast, Plaintiff's Exchange Act claims expressly alleges a fraudulent scheme. ¶¶165-248. Where, as here, "defendants are accused in

37

separate claims of the same complaint of having violated Section 11 ... and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." *Suprema*, 438 F.3d at 272; *see also Gaer v. Educ. Mgmt. Corp.*, No. CIV.A. 10-1061, 2011 WL 7277447, at *20 (W.D. Pa. Aug. 30, 2011), report and recommendation adopted, No. CIV.A. 10-1061, 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011) ("As Plaintiffs have expressly pleaded ordinary negligence with respect to the Securities Act claims ... Rule 8 applies to these claims.").

Third, Plaintiff has disclaimed all allegations of fraud from his §11 claim. ¶146. While a disclaimer standing alone is not dispositive, it is significant, especially when, as here, coupled with supporting factual allegations. *Suprema*, 438 F.3d at 270-72; *In re Valeant*, 2017 WL 1658822, at *13 n.22; *Bauer*, 2010 WL 2710443 at *4; *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at *6-*7 (E.D. Pa. Jan. 9, 2007). Thus, Plaintiff's Securities Act claims are not subject to any heightened pleading standards.

### C.   Plaintiff Adequately Alleges Falsity in the Offering

The Offering Documents were negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding CorMedix's business, operations, and prospects. The Offering Documents failed to disclose that CorMedix knew or should have known before the effective date of the Offering Documents that its DefenCath NDA did not provide sufficient CMC data necessary to achieve regulatory approval as the Company

38

had represented, and that it was at risk of receiving CRLs from the FDA, delaying the approval process. Furthermore, the Offering Documents incorporated by reference various SEC filings that were themselves false and misleading. ¶103.

Defendants' failure to disclose known flaws not only rendered the identified Offering Documents statements concealing those flaws misleading, but disclosure was also affirmatively required by Items 303 and 105 of SEC Regulation S-K. Failing to disclose information required by those items comprise §11 violations. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *In re Rediff.com India Ltd. Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004).

Item 303 requires disclosure of, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a). "Item 105 … 17 C.F.R. § 229.105, requires that an issuer '***disclose the most significant factors that make an investment in the registrant or offering speculative or risky.***'" *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) (quoting *In re Proshares Trust II Sec. Litig.*, No. 19 Civ. 886, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020)).

Defendants had a duty to disclose under Item 303 given that the FDA had already communicated insufficiency in the CMC program presented by CorMedix for the DefenCath NDA. ¶255. These identified deficiencies were known uncertainties likely

to have an unfavorable impact on the Company's results. *Id.*[12] Likewise, Defendants violated Item 105 because the Offering Documents failed to disclose the increased risks posed by the FDA's serious concerns regarding the CMC program data. ¶105.[13]

## CONCLUSION

Based on the foregoing, Defendants' motion to dismiss should be denied in its entirety. Should this Court find any deficiency in the Complaint, Plaintiff respectfully requests leave to amend.[14]

Dated: January 7, 2023          Respectfully Submitted,

**POMERANTZ LLP**
/s/ *Louis C. Ludwig*
Joshua B. Silverman (*pro hac vice)*
Louis C. Ludwig (NJ 043582008)
10 South LaSalle St., Ste. 3505
Chicago, IL 60603
Telephone: (312) 377-1181
jbsilverman@pomlaw.com

---

[12] To the extent that Plaintiff must allege specific knowledge to invoke Item 303, *see* DM at 40, Plaintiff has done so. Nor can Defendants' nearly 10 years of interactions with the FDA regarding DefenCath (*see* ¶70) be plausibly compared to the sale of "a single [product]." *Id.* (citing *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516 (W.D. Pa. 2019)).

[13] Defendants' argument that the Complaint does not state a violation of Item 105 misreads the Complaint as alleging that Defendants should have disclosed that "the FDA likely would not approve the DefenCath NDA" (DM at 14) when it actually alleges that Defendants were required to disclose the FDA's grave concerns regarding the data supporting the CMC program. ¶155.

[14] Defendants argue only that the Complaint's §§15 and 20(a) claims are inadequate for their alleged failure to plead a primary violation of §§11 and 10(b). *See* DM at 40 n.33. Because Plaintiff has adequately pleaded underlying violations, the Complaint also adequately pleads §§15 and 20(a) violations with respect to the Officer and Director Defendants.

lcludwig@pomlaw.com

**FREEDMAN NORMAND FRIEDLAND LLP**
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman (*pro hac vice*)
1 SE 3rd Ave., Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
ingo@fnf.law
vel@fnf.law

*Counsel for Lead Plaintiff and the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2023, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

**POMERANTZ LLP**

By: /s/     *Louis C. Ludwig*
        Louis C. Ludwig
        *Counsel for Lead Plaintiff*