# EXHIBIT 1

10-K 1 f10k2019_cormedixinc.htm ANNUAL REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

---

**FORM 10-K**

---

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: **December 31, 2019**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 001-34673

# CORMEDIX INC.

(Exact name of Registrant as Specified in Its Charter)

| | |
|---|---|
| Delaware | 20-5894890 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| 400 Connell Drive, Suite 5000, Berkeley Heights, NJ | **07922** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (908) 517-9500

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 Par Value | CRMD | NYSE American LLC |

Securities registered pursuant to Section 12(g) of the Act: none

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐  No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ |
| Non-accelerated filer ☐ | Smaller reporting company ☒ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any news or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

Yes ☐  No ☒

The aggregate market value of the registrant's voting common equity held by non-affiliates of the registrant, based upon the closing price of the registrant's common stock on the last business day of the registrant's most recently completed second fiscal quarter was approximately $209.3 million. Solely for the purpose of this calculation, shares held by directors and executive officers of the registrant have been excluded.

The number of outstanding shares of the registrant's common stock was 26,126,859, as of March 12, 2020.

### DOCUMENTS INCORPORATED BY REFERENCE

None

8/15/24, 4:49 PM
Case 2:21-cv-14020-JXN-CF    Document 107-3    Filed 08/21/24    Page 4 of 7 PageID: 3222
sec.gov/Archives/edgar/data/1410098/000121390020006521/f10k2019_cormedixinc.htm

**Manufacturing/Supply Chain**

We do not own or operate any manufacturing facilities related to the production of our products. All our manufacturing processes currently are, and we expect them to continue, to be outsourced to third parties. We rely on third-party manufacturers to produce sufficient quantities of drug product for use both commercially and in clinical trials. We intend to continue this practice in the future.

With regards to taurolidine, an active drug ingredient, or API, of Neutrolin, we have a Drug Master File filed with the FDA. There is a master commercial supply agreement between the third-party manufacturer, Alcami, and CorMedix in place from August 2018. We have three sources for the other key API, Heparin sodium.

We currently utilize two drug product contract manufacturer organizations, or CMO. One is for the EU and Middle East markets and the other for U.S. production. In order to assure supply, we are in the process of beginning to qualify a second CMO for U.S. vial production. All API and drug products are validated at commercial scale.

We are confident that these CMO's have adequate capacity to produce the volumes needed, and that there exists a sufficient number of potential alternate sources for the drug substances required to produce our products, as well as third-party manufacturers, that we will be able to find alternate suppliers and third-party manufacturers in the event that our relationship with any supplier or third-party manufacturer deteriorates.

**United States Government Regulation**

The research, development, testing, manufacture, labeling, promotion, advertising, distribution, and marketing, among other things, of our products are extensively regulated by governmental authorities in the United States and other countries. Our products may be classified by the FDA as a drug or a medical device depending upon the indications for use or claims. Because certain of our product candidates are considered as medical devices and others are considered as drugs for regulatory purposes, we intend to submit applications to regulatory agencies for approval or clearance of both medical devices and pharmaceutical product candidates.

In the United States, the FDA regulates drugs and medical devices under the Federal Food, Drug, and Cosmetic Act (FDCA) and the agency's implementing regulations. If we fail to comply with the applicable United States requirements at any time during the product development process, clinical testing, and during the approval process or after approval, we may become subject to administrative or judicial sanctions. These sanctions could include the FDA's refusal to approve pending applications, license suspension or revocation, withdrawal of an approval, warning letters, adverse publicity, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, civil penalties or criminal prosecution, among other actions. Any agency enforcement action and/or any related impact could have a material adverse effect on us.

*Drug Approval Process*

The research, development, and approval process in the United States and elsewhere is intensive and rigorous and generally takes many years to complete. The typical process required by the FDA before a therapeutic drug may be marketed in the United States includes:

- Pre-clinical laboratory and animal tests performed under the FDA's Good Laboratory Practices, or GLP, regulations;
- submission to the FDA of an investigational new drug application, or IND, which must become effective before human clinical trials may commence;
- human clinical studies to evaluate the drug's safety and effectiveness for its intended uses;
- FDA review of whether the facility in which the drug is manufactured, processed, packaged, or held meets standards designed to assure the product's continued quality and FDA review of clinical trial sites to determine whether the clinical trials were conducted in accordance with Good Clinical Practices, or GCPs; and
- submission of a new drug application, or NDA, to the FDA, and approval of the application by the FDA to allow sales of the drug.

During pre-clinical testing, studies are performed with respect to the chemical and physical properties of candidate formulations. These studies are subject to GLP requirements. Biological testing is typically done in animal models to demonstrate the activity of the compound against the targeted disease or condition and to assess the apparent effects of the new product candidate on various organ systems, as well as its relative therapeutic effectiveness and safety. An IND application must be submitted to the FDA and become effective before studies in humans may commence.

Case 2:21-cv-14020-JXN-CF Document 107-2 Filed 08/21/24 Page 5 of 7 PageID: 3223

6

Case 2:21-cv-14020-JXN-CF   Document 107-2   Filed 08/21/24   Page 6 of 7 PageID: 3224

In addition, under the Pediatric Research Equity Act, or PREA, an NDA or supplement to an NDA for a new active ingredient, indication, dosage form, dosage regimen, or route of administration must contain data that are adequate to assess the safety and effectiveness of the drug for the claimed indications in all relevant pediatric subpopulations, and to support dosing and administration for each pediatric subpopulation for which the product is safe and effective. The FDA may, on its own initiative or at the request of the applicant, grant deferrals for submission of some or all pediatric data until after approval of the product for use in adults, or full or partial waivers from the pediatric data requirements.

The FDA also may require submission of a risk evaluation and mitigation strategy, or REMS, to ensure that the benefits of the drug outweigh the risks of the drug. The REMS plan could include medication guides, physician communication plans, and elements to assure safe use, such as restricted distribution methods, patient registries, or other risk minimization tools. An assessment of the REMS must also be conducted at set intervals. Following product approval, a REMS may also be required by the FDA if new safety information is discovered and the FDA determines that a REMS is necessary to ensure that the benefits of the drug outweigh the risks of the drug.

The clinical trial process for a new compound can take ten years or more to complete. The FDA may prevent clinical trials from beginning or may place clinical trials on hold at any point in this process if, among other reasons, it concludes that study subjects are being exposed to an unacceptable health risk. Trials may also be prevented from beginning or may be terminated by institutional review boards, or IRBs, who must review and approve all research involving human subjects and amendments thereto. The IRB must continue to oversee the clinical trial while it is being conducted. This includes the IRB receiving information concerning unanticipated problems involving risk to subjects. Side effects or adverse events that are reported during clinical trials can delay, impede, or prevent marketing authorization. Similarly, adverse events that are reported after marketing authorization can result in additional limitations being placed on a product's use and, potentially, withdrawal of the product from the market.

Following the completion of a clinical trial, the data are analyzed by the sponsoring company to determine whether the trial successfully demonstrated safety and effectiveness and whether a product approval application may be submitted. In the United States, if the product is regulated as a new drug, an NDA must be submitted and approved by the FDA before commercial marketing may begin. The NDA must include a substantial amount of data and other information concerning the safety and effectiveness of the compound from laboratory, animal, and human clinical testing, as well as data and information on manufacturing, product quality and stability, and proposed product labeling.

Each domestic and foreign manufacturing establishment, including any contract manufacturers that we may decide to use, must be listed in the NDA and must be registered with the FDA. The application generally will not be approved until the FDA conducts a manufacturing inspection, approves the applicable manufacturing process for the drug product, and determines that the facility is in compliance with current cGMP requirements. Moreover, FDA will also typically inspect one or more clinical trial sites to confirm that the applicable clinical trials were conducted in accordance with GCPs.

Under the Prescription Drug User Fee Act (PDUFA), as amended, the FDA assesses and receives application user fees for reviewing an NDA, as well as annual program fees for commercial manufacturing establishments and for approved products. These fees can be significant. Fee waivers, reductions or refunds are available in certain circumstances. One basis for a waiver or refund of the application user fee is if the applicant is a "small business" generally defined as employing fewer than 500 employees, including employees of affiliates, no approved marketing application for a product that has been introduced or delivered for introduction into interstate commerce, and the applicant, including its affiliates, is submitting its first marketing application. Product candidates that are designated as orphan drugs, which are further described below, are also not subject to application user fees unless the application includes an indication other than the orphan indication. Under certain circumstances, orphan products may also be exempt from product and establishment fees.

Each NDA submitted for FDA approval is usually reviewed for administrative completeness and reviewability. Following this review, the FDA may request additional information rather than accept an NDA for filing. In this event, the application must be resubmitted with the additional information. The resubmitted application is also subject to review before the FDA accepts it for filing.

Once accepted for filing, the FDA's review of an application may involve review and recommendations by an independent FDA advisory committee. The FDA must refer applications for drugs that contain active ingredients, including any ester or salt of the active ingredients that have not previously been approved by the FDA to an advisory committee or provide in an action letter a summary for not referring it to an advisory committee. The FDA may also refer drugs to advisory committees when it is determined that an advisory committee's expertise would be beneficial to the regulatory decision-making process, including the evaluation of novel products and the use of new technology. An advisory committee is typically a panel that includes clinicians and other experts, which

Case 2:21-cv-14020-JXN-CF   Document 107-2   Filed 08/21/24   Page 7 of 7 PageID: 3225

review, evaluate, and make a recommendation as to whether the application should be approved and under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions.

---

8